[814 NE2d 765, 781 NYS2d 458]

AMY N. HOLTERMAN, Respondent, v ROBERT K. HOLTERMAN, Appellant.

Argued April 28, 2004; decided June 10, 2004

2

**POINTS OF COUNSEL**

*Friedman and Molinsek, P.C.,* Delmar (*Michael P. Friedman* of counsel), for appellant. I. The award of the future enhanced

earnings of a professional under New York's Equitable Distribution Law should be eliminated. (*DeAngelis v Lutheran Med. Ctr.,* 84 AD2d 17; *Eastern Consol. Props. v Adelaide Realty Corp.,* 95 NY2d 785; *Matter of Simonson v Cahn,* 27 NY2d 1; *O'Brien v O'Brien,* 66 NY2d 576; *McSparron v McSparron,* 87 NY2d 275; *Grunfeld v Grunfeld,* 94 NY2d 696.) II. The court should have awarded less than 10% of the enhanced earning capacity of defendant-appellant. (*Farrell v Cleary-Farrell,* 306 AD2d 597; *Arvantides v Arvantides,* 64 NY2d 1033; *O'Brien v O'Brien,* 66 NY2d 576; *Brough v Brough,* 285 AD2d 913; *Mallet v Mallet,* 246 AD2d 904; *Gandhi v Gandhi,* 283 AD2d 782; *Cozza v Colangelo,* 298 AD2d 914.) III. It was inappropriate for the court to award child support, maintenance, and enhanced earnings from the same income stream. (*McSparron v McSparron,* 87 NY2d 275; *Grunfeld v Grunfeld,* 94 NY2d 696; *Rochelle G. v Harold M.G.,* 170 Misc 2d 808; *Douglas v Douglas,* 281 AD2d 709.) IV. The court inappropriately awarded attorney's and expert fees. (*O'Shea v O'Shea,* 93 NY2d 187; *Richards v Richards,* 189 AD2d 1025; *McCarthy v McCarthy,* 172 AD2d 1040; *Garges v Garges,* 175 AD2d 511; *Treffiletti v Treffiletti,* 252 AD2d 635; *Newton v Newton,* 246 AD2d 765; *Wacholder v Wacholder,* 188 AD2d 130.)

*Flaherty & O'Brien,* Albany (*Shawn D. Flaherty* of counsel), for respondent. I. *O'Brien v O'Brien* (66 NY2d 576 [1985]) should *not* be overruled. (*McSparron v McSparron,* 87 NY2d 275.) II. There is no basis upon which to disturb the award to plaintiff of 35% of the marital portion of defendant's enhanced earning capacity. (*O'Brien v O'Brien,* 66 NY2d 576; *Arvantides v Arvantides,* 64 NY2d 1033; *Chadwick v Chadwick,* 256 AD2d 1211; *Torgersen v Torgersen,* 188 AD2d 1023; *Owens v Owens,* 288 AD2d 782; *Brough v Brough,* 285 AD2d 913; *McSparron v McSparron,* 87 NY2d 275; *Farrell v Cleary-Farrell,* 306 AD2d 597; *Cozza v Colangelo,* 298 AD2d 914.) III. The trial court did not inappropriately award child support, maintenance and enhanced earnings from the same income stream. (*McSparron v McSparron,* 87 NY2d 275; *Grunfeld v Grunfeld,* 94 NY2d 696; *Erickson v Erickson,* 281 AD2d 862; *Matter of Cassano v Cassano,* 85 NY2d 649; *Bast v Rossoff,* 91 NY2d 723; *Matter of Graby v Graby,* 87 NY2d 605.) IV. The awards of counsel and expert fees to plaintiff have been improperly raised on this appeal and should not be disturbed. (*Quain v Buzzetta Constr. Corp.,* 69 NY2d 376; *O'Shea v O'Shea,* 93 NY2d 187; *DeCabrera v Cabrera-Rosete,* 70 NY2d 879; *Melnitzky v Melnitzky,* 284 AD2d 240.)

*Bruce J. Wagner,* Albany, *Kenneth David Burrows, Arnold Da-*

*vis, Christopher S. Mattingly* and *Stanley Plesent* for American Academy of Matrimonial Lawyers, New York Chapter, amicus curiae. I. This Court should caution trial courts to make awards which comport with economic reality. (*Madori v Madori,* 201 AD2d 859; *Aborn v Aborn,* 196 AD2d 561; *Mullin v Mullin,* 187 AD2d 913.) II. This case presents this Court with an opportunity to decide whether there should be a proscription against triple counting. (*Grunfeld v Grunfeld,* 94 NY2d 696; *McSparron v Mc-Sparron,* 87 NY2d 275; *Goodman v Goodman,* 195 Misc 2d 204.)

## OPINION OF THE COURT

GRAFFEO, J.

We are being asked in this matrimonial case to determine whether Supreme Court erred by declining to adjust defendant's child support obligation to account for the distributive award payments he was obligated to pay plaintiff for her share of the future enhanced earnings attributable to his medical license. We conclude that Supreme Court did not err as a matter of law and in particular, under the circumstances of this case, did not abuse its discretion in determining the distributive award or in its application of the Child Support Standards Act (CSSA).

### I.

Plaintiff Amy Holterman (wife) and defendant Robert Holterman (husband) were married in 1981. At the time of the parties' marriage, husband was a third-year student at a medical school in Philadelphia. Wife, who had a Master's degree in business administration, was employed full time as a program analyst and her income contributed to the support of the household. Husband graduated from medical school in 1983 and obtained his license to practice medicine the following year. The parties then moved to another locale in Pennsylvania where husband began a three-year medical residency program. Shortly thereafter, wife began experiencing significant health problems and was eventually diagnosed with chronic fatigue syndrome and fibromyalgia. The parties agreed that wife would become a homemaker due, in part, to her chronic health problems. Their first child was born in 1985 and a second child was born in 1991.

Husband continued to advance his professional credentials, becoming board-certified in emergency medicine in 1987. From 1986 to 1990 he was employed as an attending staff physician at a hospital. Once husband received his license to practice

medicine in New York, the family moved to Albany. Since that time, husband has been an emergency room physician at a hospital, earning a salary of $181,837 in 2000.

After 19 years of marriage, wife commenced an action for divorce in September 2000. Husband waived his right to answer the complaint and the parties entered into a stipulation of joint custody of their two children with wife having primary physical custody. Following the bench trial of this action, Supreme Court issued its findings of fact and conclusions of law in April 2002 and a judgment of divorce was entered in October 2002. The court dissolved the marriage based on husband's constructive abandonment of wife; awarded wife maintenance of $35,000 per year for five years and $20,000 per year thereafter for the remainder of her life; determined that wife was entitled to $214,200 as her equitable share of husband's enhanced earnings premised on his medical license; ordered husband to pay child support for their two children in the amount of $34,875.65 annually; distributed the marital property, including equally dividing $242,815.39 in retirement and investment accounts; gave wife title and possession of the marital residence and set husband's half share of the parties' equity in the marital home at $29,268.48; obligated wife to pay the mortgage, home equity loan payments and taxes on the residence (totaling about $26,500 per year); required husband to maintain certain health and life insurance policies for the benefit of wife and the children; divided equally a tax refund check and a mortgage escrow refund check; ordered husband to reimburse wife for certain expenses pertaining to the children; and directed husband to contribute $20,894 toward wife's counsel and expert fees.

The Appellate Division affirmed, with one modification affecting husband's obligation to maintain life insurance coverage.[1] This Court granted husband's application for leave to appeal.

---

1. The Appellate Division modified husband's obligation to maintain life insurance policies for the benefit of wife and the children by requiring him to keep an existing $500,000 policy, with wife as the primary beneficiary, until his obligations to pay child support, maintenance and the distributive award were satisfied, or until the expiration of the 20-year term life insurance contract, whichever first occurs. He was also directed to maintain $300,000 in life insurance coverage provided through his employer until the termination of his three payment obligations or upon his retirement from the practice of medicine, whichever occurs sooner.

## II.

On appeal, husband raises several challenges relating to the equitable distribution of the value of his medical license, which require that we address the award in some detail. Supreme Court and the Appellate Division determined that the marital portion of husband's medical license had a present-day value of $612,000 in accordance with testimony presented by wife's expert, a certified public accountant.[2] Husband did not challenge the methodology employed by the expert or the economic value of the license itself. In fact, he did not present any expert testimony. The court determined that wife was entitled to 35% of the value of husband's enhanced earning capacity as a licensed physician, which amounted to $214,200. The court then deducted $29,268.48 from that figure, representing the credit due husband for the conveyance of his interest in the marital residence, thereby establishing a net distributive award of $184,931.52 owed to wife. Husband was directed to pay the award in monthly installments over a 15-year period, at six percent interest per annum from the date of commencement of the action, resulting in annual payments of $21,288. Husband contends that Supreme Court abused its discretion by awarding wife 35% of the marital portion of the enhanced earning capacity derived from his medical license and asserts that her share should be reduced to no more than 10%. We disagree.

In recognizing marriage as an economic partnership, the Domestic Relations Law mandates that the equitable distribution of marital assets be based on the circumstances of the particular case and directs the trial court to consider a number of statutory factors listed in Domestic Relations Law § 236. These factors encompass the income and property of each party at the

---

2. Wife's expert testified that he arrived at this valuation by comparing the average income of a college graduate with husband's actual income for a period of time from 2000 until 2022, when husband would reach age 65. He computed husband's baseline earnings (his earning capacity without a medical license) at $69,000 and husband's topline earnings (his actual earnings, measured as of the commencement date by averaging his 1999 and 2000 incomes) at $183,000. After considering federal and state income taxes, Federal Insurance Contributions Act (FICA) taxes, a real rate of 3.4% (representing the relationship between growth and discount rates) and "LPE" factors (used to calculate the risks and events that could interrupt, shorten, or lengthen an individual's work life expectancy), the expert capitalized the difference between the adjusted baseline and topline earnings and discounted the amount to a present value of $874,000. Because husband had completed 2.1 out of 7 years of medical training before the marriage, a coverture factor of 70% (4.9/7) was applied to determine the final present value of $612,000.

time of marriage and at the time of commencement of the divorce action, the duration of the marriage, the age and health of the parties, any maintenance award, and the nontitled spouse's direct or indirect contributions to the marriage, including "services as a spouse, parent, wage earner and homemaker" (Domestic Relations Law § 236 [B] [5] [d]).

As this Court declared in *O'Brien v O'Brien* (66 NY2d 576, 588 [1985]), these considerations are particularly relevant when evaluating the parties' respective contributions to the attainment of a professional license by one spouse.[3] In *O'Brien*, we held that a professional license is marital property subject to equitable distribution. In the 19 years since we adopted the *O'Brien* rule, we have adhered to the principle that both parties in a matrimonial action are entitled to fundamental fairness in the allocation of marital assets, and that the economic and noneconomic contributions of each spouse are to be taken into account. Trial courts that examine the statutory factors are granted substantial discretion in determining the extent to which the distribution of marital property, including enhanced earnings attributable to a professional license, will be equitable. Absent an abuse of discretion, this Court may not disturb the trial court's award (*see Arvantides v Arvantides*, 64 NY2d 1033, 1034 [1985]).

Here, Supreme Court issued a careful, comprehensive decision addressing all relevant factors, including the parties' 19-year marriage, wife's employment and monetary contributions during husband's final two years of medical school, the parties' mutual decision that wife would forgo her career to take care of the children and home, the gross disparity in the parties' current and probable future incomes, the fact that husband was 44 years of age and wife was 46 years of age at the time of trial and husband's good health in contrast to wife's chronic health difficulties. In light of these considerations, particularly wife's economic and noneconomic contributions to husband's acquisition of his medical license and subsequent career, the termination of wife's career to raise the parties' two children and maintain the marital household, wife's absence from the job

---

**3.** Husband did not seek to overturn the precedent established in *O'Brien v O'Brien* (66 NY2d 576 [1985]) in either Supreme Court or the Appellate Division. To the extent he now suggests a modification or the elimination of our holding that future enhanced earnings attributable to a professional license are subject to equitable distribution, that argument is unpreserved and therefore not properly before us for review.

market for more than 17 years, the length of the marriage and wife's long-term health problems, we cannot conclude that Supreme Court abused its discretion in awarding wife 35% as her marital portion of husband's enhanced earning capacity as a physician practicing medicine in New York.

## III.

■ Husband next argues that the payment of $21,288 per year—the annual installment payment of wife's distributive award of her share of enhanced earnings from his medical license—should be deducted from the computation of his income in determining his child support obligation under the CSSA and, concomitantly, that amount should be included as income attributable to wife.[4] He claims that the failure of the courts below to perform such reassignment of income results in "double dipping" from the same income stream—i.e., awarding both child support and equitable distribution of his future enhanced earnings from the same income source, his salary as a physician. He therefore claims that the courts below erred as a matter of law in violating the antiduplication principles enunciated in *McSparron v McSparron* (87 NY2d 275 [1995]) and *Grunfeld v Grunfeld* (94 NY2d 696 [2000]). We hold that husband's proposed reallocation formula—or any formula that requires a deduction of a distributive award paid over a period of years from the licensed spouse's income for purposes of calculating child support—is impermissible under the CSSA.[5]

The CSSA (*see* Domestic Relations Law § 240 [1-b]) was enacted in 1989 to establish a uniform method for calculating child support, recognizing that a parent's "[r]esponsibility for children does not end when a parent is absent from the household" (Governor's Program Bill Mem, at 1, Bill Jacket, L 1989, ch 567). The CSSA was designed to ensure that children

---

4. Husband cites *Goodman v Goodman* (195 Misc 2d 204 [Sup Ct, Nassau County 2003]) as an example of his proposed treatment of enhanced earnings awards in child support computations. Husband also observes that wife's expert testified that such a reassignment formula should be applied in this case. For the reasons expressed in this opinion, we decline to do so.

5. The dissent equates a professional license to income-producing property, such as an apartment building or stock. But where a professional license is at issue, "[t]he asset is totally indistinguishable and has no existence separate from the projected professional earnings from which it is derived" (*Grunfeld v Grunfeld*, 94 NY2d 696, 704 [2000]). Hence, a trial court must convert the enhanced earnings attributable to the license into a monetary marital asset to achieve equitable distribution. In contrast, a court can transfer title to real or personal property in order to equitably distribute the asset.

"not unfairly bear the economic burden of parental separation" (Sponsor's Mem, Bill Jacket, at 1, L 1989, ch 567). Its aim is to maintain the children's marital standard of living after their parents separate: "Children should be protected as much as possible from the overall decline in living standards that results from parents maintaining two households" (*id.*).

As we explained in *Matter of Cassano v Cassano* (85 NY2d 649, 652 [1995]), the CSSA provides "a precisely articulated, three-step method for determining child support." The first step requires the computation of "combined parental income" (Domestic Relations Law § 240 [1-b] [b] [4]; [c] [1]). "The amount of 'income' attributed to each parent is derived by adding gross income, as reported on the most recent Federal tax return, and, to the extent not included as gross income, investment income, imputed income and other 'income received' by the parent from eight enumerated sources" (*Matter of Graby v Graby*, 87 NY2d 605, 609-610 [1996], citing Family Ct Act § 413 [1] [b] [5]).[6]

After computing statutory income, a limited number of deductions are allowable under Domestic Relations Law § 240 (1-b). The CSSA provides for eight categories of deductions from income, which include maintenance payments and Federal Insurance Contributions Act taxes paid (*see* Domestic Relations Law § 240 [1-b] [b] [5] [vii] [A]-[H]).[7] Significantly, the receipt of distributive award payments is not a statutory category of income, nor is the payment of a distributive award a recognized deduction.[8]

---

6. Family Court Act § 413 parallels Domestic Relations Law § 240 (1-b). Both statutes were enacted as part of the CSSA (*see* L 1989, ch 567, §§ 7, 8). The eight enumerated sources of income received are workers' compensation, disability benefits, unemployment insurance benefits, Social Security benefits, veterans benefits, pensions and retirement benefits, fellowships and stipends, and annuity payments (*see* Domestic Relations Law § 240 [1-b] [b] [5] [iii] [A]-[H]).

7. Specifically, a spouse may deduct, with certain limitations and conditions: unreimbursed employee business expenses, alimony or maintenance paid to a nonparty spouse, alimony or maintenance paid to the spouse that is a party to the instant case, child support paid on behalf of any child not subject to the instant case, public assistance, supplemental security income, New York City or Yonkers income or earnings taxes and FICA taxes (*see* Domestic Relations Law § 240 [1-b] [b] [5] [vii] [A]-[H]).

8. A parent may have other financial obligations that, from a practical standpoint, reduce the parent's expendable income, but which are not deductible under the CSSA. For example, the Legislature decided not to allow as a

The court next multiplies the combined parental income figure, up to a ceiling of $80,000, by a designated percentage based on the number of children to be supported, and then allocates that amount between the parents, applying each parent's respective portion of the total income to reach the amount of each parent's support obligation (Domestic Relations Law § 240 [1-b] [b] [3]; [c] [2]). In the final step, where combined parental income exceeds $80,000, "the court shall determine the amount of child support for the amount of the combined parental income in excess of such dollar amount through consideration of the factors set forth in paragraph (f) of [Domestic Relations Law § 240 (1-b)] and/or the child support percentage" (Domestic Relations Law § 240 [1-b] [c] [3]).

In this case, Supreme Court utilized husband's 2000 gross income of $181,837 and deducted his maintenance obligation and FICA contribution, arriving at a combined parental income of $139,502.60, all of which was attributable to husband. Applying the child support mandated percentage of 25% for two children to this sum, the court determined that husband must pay $34,875.65 annually in child support.

Husband asserts that his annual $21,288 installment payment of wife's distributive award should also be deducted from his income and included as income attributed to his wife for purposes of the CSSA computations. Although wife's expert opined that a reassignment of income adjustment should be undertaken to avoid double dipping of husband's income stream, the CSSA does not provide for the deduction of distributive awards from income, whether based on enhanced earning capacity due to a professional license or otherwise. Nor does the CSSA authorize the inclusion of a distributive award as income to the parent receiving the award. This lack of inclusion in either the list of permissible statutory deductions or the definition of income is understandable because distributive awards "reflect, not income, but a property distribution" of the marital assets (Scheinkman, New York Law of Domestic Relations § 14:36, 2003 Pocket Part, at 131 [11 West's NY Prac Series 1996]). Indeed, the Domestic Relations Law, which defines a distributive award as "payments provided . . . in lieu of or to supplement, facilitate or effectuate the division or distribution of property," makes clear that distributive awards should not be treated

---

deduction against a parent's income a court-ordered obligation to make monthly credit card payments pertaining to expenses incurred by the other spouse.

as income for tax purposes (Domestic Relations Law § 236 [B] [1] [b] ["Distributive awards shall not include payments which are treated as ordinary income to the recipient under the provisions of the United States Internal Revenue Code"]). Had the Legislature intended to make distributive awards deductible from one parent's income and includable in the other's, it could easily have so provided. Simply put, it appears that the Legislature did not wish to have a child's lifestyle and support altered based on a distributive award. In sum, husband's proposed methodology conflicts with the plain language of the CSSA.

Even if husband could overcome the statutory construction hurdle, his proposed methodology would be unworkable in many instances because it fails to address situations where a licensed parent satisfies a distributive award obligation by making a lump-sum cash payment or transfers a noncash asset (such as interest in real property) rather than making periodic cash payments over a number of years. For instance, in this case, if a lump-sum distributive payment had been ordered, under husband's methodology the payment would have been deducted from his income and applied to wife, offsetting all of husband's earnings or other income for that year and shifting the entire child support burden to wife, who is not employed. Wife then would necessarily have to meet the support obligation from the proceeds of her distributive award. Likewise, if a spouse satisfies a distributive award by transferring his or her title and equity in real property to the other spouse, the value of the one-time transfer would skew the transferor's income for CSSA purposes under husband's proposal. The result in these scenarios would clearly be inequitable to the recipient spouse and the children. Under husband's reassignment theory, the manner in which the distributive award is paid out would dictate whether or not it requires an adjustment in income allocation for purposes of child support. We see no reason to treat a distributive award paid in periodic installments differently than an award satisfied by the transfer of a noncash asset or lump-sum payment. Indeed, in this case the award was partially paid by transfer of husband's interest in the marital residence to wife. However a distributive award is paid—whether in installments derived from the license holder's income stream, by lump-sum payment or by other asset transfer—the CSSA does not permit the award to be viewed as income for the purpose of allocating combined parental income.

*McSparron* and *Grunfeld* do not dictate a contrary result. In *McSparron*, this Court warned that "care must be taken to ensure that the monetary value assigned to the license does not overlap with the value assigned to other marital assets that are derived from the license such as the licensed spouse's professional practice," and cautioned the lower courts to "be meticulous in guarding against duplication in the form of *maintenance* awards that are premised on earnings derived from professional licenses" (87 NY2d at 286 [emphasis added]).

In *Grunfeld*, this Court reaffirmed the *McSparron* prohibition against duplicative awards and noted that to avoid "double counting," courts must reduce either the income available to make maintenance payments or the marital assets available for distribution, or some combination of the two. Specifically, we held that "[o]nce a court converts a specific stream of income into an asset, that income may no longer be calculated into the *maintenance* formula and payout" (*Grunfeld*, 94 NY2d at 705 [emphasis added]).[9]

Notably, neither *McSparron* nor *Grunfeld* discussed double counting vis-à-vis child support. Rather, in each case we held that a court may not award maintenance and the distribution of enhanced earnings attributable to a professional license from the same income stream. Unlike maintenance, child support is governed by a precise formula in the CSSA, which simply does not authorize a court to deduct a distributive award from the titled spouse's income.

Husband also argues that Supreme Court abused its discretion by refusing to adjust his child support obligation upon its consideration of the distributive award of his medical license as a "paragraph (f)" factor with respect to parental income in excess of $80,000 (*see* Domestic Relations Law § 240 [1-b] [f]). In a related argument, husband claims that Supreme Court abused its discretion by failing to disregard the statutory child support formula as "unjust or inappropriate" in favor of a reduced child support award based on the distributive award.

As earlier mentioned, step three of the CSSA's formula requires the trial court to consider the "paragraph (f)" factors

---

**9.** To the extent husband suggests Supreme Court engaged in double dipping by awarding maintenance and the equitable distribution of the medical license from the same income stream, such contention is meritless. Supreme Court properly awarded maintenance based solely on husband's remaining income after subtraction of the amount attributable to the marital portion of the medical license.

for income in excess of $80,000. The "paragraph (f)" factors include "[t]he financial resources of the custodial and non-custodial parent," the child's "special needs and aptitudes," "[t]he standard of living the child would have enjoyed" if the marriage had not ended, any tax consequences, a determination that one parent's gross income "is substantially less than the other parent's gross income," and "[a]ny other factors the court determines are relevant in each case" (*id.*).

Moreover, after completing the three-step formula, the trial court may adjust the amount calculated only if, after examining the "paragraph (f)" factors, it finds that the noncustodial parent's share is "unjust or inappropriate" (Domestic Relations Law § 240 [1-b] [a], [f]). Where the trial court concludes the amount calculated to be "unjust or inappropriate," it must order the noncustodial parent to pay an amount it deems "just and appropriate" and is required to set forth in its decision the "paragraph (f)" factors it considered (Domestic Relations Law § 240 [1-b] [g]).

■ We agree with husband that a distributive award to be paid by one parent to the other pertains to the financial resources of the parties and therefore is an appropriate paragraph (f) factor that the trial court may consider when awarding child support. However, on this record, we cannot say that Supreme Court abused its discretion by failing to modify husband's child support obligation based on his distributive award obligation.

Here, in carefully determining whether to apply the child support percentage of 25% to all income in excess of $80,000, Supreme Court expressly indicated that it considered the distributive award and maintenance obligations, the substantial disparity in gross income between the parties, as well as the upper middle-class lifestyle the children would have enjoyed had the parties not divorced. The family had taken frequent vacations, the children received allowances and engaged in extracurricular pursuits, and the daughter, who is musically talented, had taken private music lessons and had traveled with the Empire State Youth Orchestra. Under these circumstances, we cannot say Supreme Court abused its discretion by applying the statutory percentage of 25% to husband's income in excess of $80,000.

■ Nor did Supreme Court abuse its discretion in failing to deem husband's support obligation calculated under the three-step statutory formula "unjust or inappropriate." Although

Supreme Court did not—and was not required to—explicitly state that it found the statutory formula just and appropriate, it necessarily found the formula to be so, by considering the effect of the distributive award in its decision to apply the full 25% to husband's income in excess of $80,000. Based on the aforementioned factors, including the preservation, to the extent possible, of the children's standard of living, Supreme Court appropriately applied the statutory formula.

We are not unmindful of the financial burdens husband currently faces. We note, however, that husband's child support obligation will substantially decrease when the parties' older child turns 21 in April 2006 and will cease when the younger child reaches 21 in April 2012. Moreover, husband's maintenance obligation will decrease from $35,000 to $20,000 in 2007. Thus, although husband is now paying wife approximately $91,000 a year under Supreme Court's order, in 2006 his payments to wife will be reduced to about $80,000, and in 2007, those payments will be further diminished to approximately $67,000. When husband's child support obligation ends, his annual payments to wife will be about $41,000, presuming she does not remarry, which would terminate her receipt of maintenance.

Moreover, although Supreme Court did not express a final computation representing husband's annual financial obligation to wife and his children, the court certainly was aware of the extent of its detailed findings of fact and conclusions of law underlying the judgment of divorce. In the exercise of their fact-finding authority, if the trial court or Appellate Division had concluded that husband faced an unjust financial burden based on the overall economic outcome in this case, either court could have reduced husband's maintenance obligation or wife's equitable share of husband's future enhanced earnings premised on his medical license. Based on the factual determinations in this case, however, it was not an error of law for the courts to decline to do so.

## IV.

Husband's remaining contentions regarding attorney and expert fees are similarly without merit. Where, as here, the Appellate Division's affirmance of an award of counsel fees and expert fees "cannot be characterized as an abuse of discretion as a matter of law, the issue is beyond our review" (*O'Brien*, 66 NY2d at 590).

Accordingly, the order of the Appellate Division should be affirmed, with costs.

R.S. SMITH, J. (dissenting). I think the decision of Supreme Court, which the Appellate Division affirmed, is flawed in three ways. First, it fails to consider or justify the total burden that the multiple rulings it contains place upon defendant. Secondly, it adopts an illogical and unfair method of allocating the parties' income for purposes of calculating child support payments. And thirdly, it applies our decision in *O'Brien v O'Brien* (66 NY2d 576 [1985]) on facts totally opposite, in material respects, to the facts of *O'Brien* itself—resulting in an application of *O'Brien* that does no good at all, but does considerable harm. For all these reasons, I dissent from the majority's decision to affirm.

I

In a 27 page opinion, Supreme Court made detailed findings of fact and a series of discrete rulings, including awards of maintenance, child support, equitable distribution and attorneys' and expert fees. In justifying each of these rulings, the court referred to the appropriate statutory and other factors. Only one thing is missing from this otherwise meticulous analysis: Supreme Court never even mentions, much less evaluates, the cumulative impact of its rulings.

That impact is to impose a very significant burden on defendant—to require him, for several years, to pay to his ex-wife more than two thirds of his net income, and even in the more distant future to pay her as much as he keeps for himself. Defendant's brief in this Court contains the following chart, which summarizes the burden on him in the first year following Supreme Court's award:

| Income | $181,837 |
|---|---|
| Minus FICA (1233) | ($7,403) |
| Minus Maintenance | ($35,000) |
| Minus Taxes | ($46,882) |
| Minus Child Support | ($34,875) |
| Minus Equitable Distribution (with interest) | ($21,288) |
| Minus Attorney's Fees | ($20,000) |
| **NET MONEY AVAILABLE FOR DEFENDANT APPELLANT** | **$16,389** |

Plaintiff's brief notes, correctly, that the $20,000 attorneys' fee payment is a one-time obligation. With that exception,

however, plaintiff takes no issue with the above-quoted calculation. Even if the attorneys' fees are ignored, defendant is left with approximately $36,000 of a pretax income of $181,000.

It is true that the burden on defendant remains at this level only for four years after the award; after that, child support will be reduced because the parties' older child will become emancipated, and a year later maintenance will drop to a lower level pursuant to Supreme Court's order. But even then, the burden will be a major one. My own calculations suggest that, assuming defendant's income does not much change (and again ignoring the attorneys' fee award) defendant is required to pay more than two thirds of his after-tax income to plaintiff for the first four years; some 60% in the fifth year; about half of it in years 6 through 10; and nearly a third of it for five years after that. It is not until 15 years after the award that defendant's obligations (at that point consisting only of maintenance) diminish to something like 12% of his income (calculating both the income and the obligations on an after-tax basis).[1]

I do not assert that the imposition of this level of burden on defendant is, as a matter of law, an abuse of discretion. It is possible that a careful comparison of defendant's resources and needs with the needs of plaintiff and the children would justify it. I do suggest, however, that it was an abuse of discretion for Supreme Court not even to consider whether the overall result of its various awards was fair. Indeed, it is not clear from Supreme Court's opinion that the court was even aware of the cumulative impact of its rulings. One portion of the opinion suggests that it was not: In awarding attorneys' and expert fees, the court listed the factors that it considered—the first of them being "[t]he gross disparity between plaintiff's and defendant's income." Supreme Court may not have realized that, giving effect to decisions it had made earlier in its opinion, the "disparity" would be for several years in plaintiff's favor.

I would therefore vacate Supreme Court's judgment and direct Supreme Court to reconsider it, giving due weight not just to the components of its rulings, but to their cumulative impact.

---

1. While the absolute dollar figures recited at page 15 of the majority opinion are accurate—and confirm that the burden on defendant is a large one—I believe that the relative figures in this opinion are more illuminating. The majority opinion fails to note that, while defendant's maintenance payments are tax deductible, his payments for child support and equitable distribution are not. Thus while the majority is correct in saying that defendant "is now paying . . . approximately $91,000 a year" (about half his pretax income), his payments are much more burdensome on an after-tax basis.

## II

In calculating child support, Supreme Court began, as the Child Support Standards Act (CSSA) requires, by considering the income of each party. It proceeded, however, on the false assumption that the income of each (prior to making the deductions permitted by statute) would be what it was before the divorce. This assumption was necessarily false, because Supreme Court's equitable distribution award required the transfer from defendant to plaintiff of 35% of the value of a significant income-producing asset.

Supreme Court, applying our decision in *O'Brien*, treated as a marital "asset" what it described as "[t]he marital portion of the enhanced earning capacity of defendants's [*sic*] medical education, medical degree, medical license, residency and Board Certification in emergency medicine." In the next section of this dissent, I will try to show that it was error to apply *O'Brien* to this case, but Supreme Court did apply it, and I assume for purposes of this section of my opinion that Supreme Court was correct to do so. Indeed, to simplify matters, it is useful for present purposes to put aside the conceptual complexities of *O'Brien* and to analyze defendant's medical license as though it were any other income-producing asset—corporate stock, for example, or real property held for investment.

When income-producing property is owned by a husband or wife who is divorced, it is often appropriate to order part or even all of it equitably distributed to the other spouse. When that is done, however, it makes no sense at all to calculate child support as though no such distribution had occurred—as though the transferring spouse still owned the asset and received the income it generated. Yet the majority concludes that this irrational procedure is required by the CSSA—as indeed it would be, except that the CSSA expressly permits departure from its formula to avoid an "unjust or inappropriate" result.

The starting point for calculating a parent's income under the CSSA is that parent's "gross (total) income as should have been or should be reported in the most recent federal income tax return" (Domestic Relations Law § 240 [1-b] [b] [5] [i]). In other words, income is normally allocated to the spouse who was required to report that income for federal income tax

purposes.[2] The statute thus proceeds on the assumption that child support should be calculated on the basis of each party's income immediately before the divorce.

In most cases, this is a perfectly reasonable assumption. It is not reasonable at all, however, where an income-producing asset is transferred from one spouse to another as part of the divorce. A few oversimplified examples will make the absurdity clear:

(1) Suppose the parties' sole source of income is a rental apartment building. The building is in the husband's name and thus, on his most recent tax return, the income from it was his. Suppose that, as part of the divorce, the asset is divided equally between the parties—so that each will have the same income after the divorce. If income is allocated solely on the basis of the pre-divorce tax returns, one spouse will seem to have all the income and the other none—although their incomes are in fact exactly the same.

(2) Suppose that the building is in the husband's name prior to the divorce, but *all* of it is distributed to the wife as part of the divorce. She now has all the income. Yet, if she receives custody of the children, the "most recent tax return" approach requires him to pay her child support as though he had all the income and she had none.

(3) Suppose the asset (say, in this case, stock in a closely held corporation) is in the wife's name, so that all the income has been hers for federal tax purposes. Suppose that the asset is distributed to the husband upon divorce; this might occur if, for example, the husband had been actively involved in running the business and the wife had not. Now the husband has all the income and the wife has none. Assuming that the wife gets custody of the children, the wealthy husband will pay the penniless wife nothing in child support.

These extreme hypotheticals may rarely be encountered, but a less extreme version of the same anomaly will occur in many cases, and has occurred in this one. The court awarded plaintiff, in substance, 35% of the "marital" portion of defendant's medical license, yet child support is calculated as though the defendant still owned 100%. The effect in this case is significant,

---

**2.** Often, of course, a married couple will file a joint federal income tax return. Where that occurs, the statute requires that each of them "prepare a form, sworn to under penalty of law, disclosing his/her gross income individually" (Domestic Relations Law § 240 [1-b] [b] [5] [i]). I take this to mean that each spouse must treat as his or her own income the income that would be disclosed on that spouse's return if the couple filed separately.

though not huge; by my calculation, it inflates the child support award by some $7,000 per year. Much more troubling, the majority opinion sets a precedent that seems to require mechanical application of the "most recent tax return" rule in every child support calculation, even where the results are as bizarre as those in the hypotheticals I offered above.

The only justification offered by the majority for this rule is that the statute requires it—and, if the statute had no escape clause, the majority would be right. The authors of the CSSA apparently failed to anticipate the need to reallocate income where income-producing assets are transferred. The authors were wise enough, however, to realize that they could not anticipate everything—and therefore the statute does have an escape clause that seems to have been written precisely to avoid results like the one the majority reaches today.

Under Domestic Relations Law § 240 (1-b), the noncustodial parent must pay his or her "pro-rata share of the basic child support obligation," based on "income" as defined in the statute, *"[u]nless the court finds that the non-custodial parent['s] pro-rata share of the basic child support obligation is unjust or inappropriate"* (*id.* ¶ [f] [emphasis added]). Thus, the statute expressly authorizes departure from the statutorily calculated "pro-rata share" where a failure to depart would produce an "unjust or inappropriate" result. The statute lists 10 "factors" to be considered in making a departure, of which the first is: "[t]he financial resources of the custodial and non-custodial parent, and those of the child" (*id.* cl [1]). Where an income-producing asset changes hands as part of the divorce, the "financial resources" of one party are greater, and those of the other are less, than the statutory formula assumes. If this is not an instance where the parties' "financial resources" render the "pro-rata share" as calculated by statute "unjust or inappropriate" I find it hard to imagine what such a case would be.

In *Goodman v Goodman* (195 Misc 2d 204 [Sup Ct, Nassau County 2003]), the court recognized the applicability of the CSSA's escape clause to this kind of case. *Goodman* held that, in calculating child support, "the income from a distributive award for enhanced earnings capacity should be attributed to the non-titled spouse and be reduced from the income of the titled spouse" (195 Misc 2d at 204-205). The *Goodman* court relied on our decisions in *McSparron v McSparron* (87 NY2d 275 [1995]) and *Grunfeld v Grunfeld* (94 NY2d 696 [2000]), cases discussing the relationship between equitable distributions under the *O'Brien* rule and maintenance awards.

In *McSparron*, we said that "[t]he courts must . . . be meticulous in guarding against duplication in the form of maintenance awards that are premised on earnings derived from professional licenses" (87 NY2d at 286). In *Grunfeld* we held that to use the same income as a basis for a distributive award and an award of maintenance is impermissible double counting. "To allow such duplication would, in effect, result in inequitable, rather than equitable, distribution" (94 NY2d at 704). The majority today distinguishes *McSparron* and *Grunfeld* on the ground that child support, unlike maintenance, is governed by a statutory formula. But since the CSSA specifically provides for departure from its formula when adherence to it would be "unjust or inappropriate," I agree with the *Goodman* court that the common sense underlying *McSparron* and *Grunfeld* should be applied in the child support context as well.

The injustice of a wooden application of the statutory formula where an income-producing asset has been distributed is so blatant that it was recognized in this case by plaintiff's own expert witness. John R. Johnson, a valuation expert, testified that while he knew that "duplication within the context of child support" was, legally, an open question, "I feel intellectual honesty would suggest we still have only one income stream." He testified that "the only way to really equitably determine the relative child support obligation" would be to make an adjustment taking account of the equitable distribution. In his child support calculation, he reallocated to plaintiff—the party who employed him—the portion of defendant's income that would in effect be distributed to plaintiff upon the divorce. Today, the majority concludes that such a reallocation, however clearly "intellectual honesty" compels it, is forbidden by the CSSA.

The majority completely fails to explain, however, why the CSSA's "unjust or inappropriate" escape clause should not be invoked here. It is obvious, and the majority does not dispute, that the parents' "financial resources"—the first factor that Domestic Relations Law § 240 (1-b) (f) directs the court to consider—are materially different from what the statutory formula assumes them to be. This necessarily implies that, in the words of section 240 (1-b) (f), the "non-custodial parent['s] pro-rata share of the basic child support obligation is unjust or inappropriate." The facts relied on by the majority—including the family's frequent vacations and the daughter's private music lessons (majority op at 14)—do not affect this conclusion.

The majority never comes to grips with the conceptual error inherent in using a statutory formula based on the parties' pre-divorce income where an income-producing asset is transferred as part of the divorce. The issue here is not, as the majority puts it, whether "to make distributive awards deductible from one parent's income and includable in the other's" (majority op at 12). It is whether to reallocate—not deduct—the income that accompanies a transferred income-producing asset—whether that asset is a medical license or an apartment building. The court in *Goodman* characterized this issue correctly:

> "[w]hile the appropriate deductions to determine the correct level of child support, as elucidated above, are contemplated and authorized by case law and statutory authority, the income reallocation discussed here is *not* part of a 'deductibility issue'—rather, it is a mathematical reallocation of income from one parent who gives, to the other parent, who receives, in the form of a distributive award for enhanced earnings. The appropriate public policy concern, thus, is *not* the preclusion of income from which to award child support—this will not happen here at all. Rather, the appropriate and real focus is the reassignment of income between the parents and the court's proper recognition and treatment of it, to calculate and determine each of the parents' correct income and appropriate 'pro rata' share of the child support obligation. (*See,* Domestic Relations Law § 240 [1-b] [f].)" (195 Misc 2d at 208-209.)

Because the majority does not recognize the special problem raised by the equitable distribution of an income-producing asset, it lists reasons why defendant's "proposed methodology would be unworkable in many instances" (majority op at 12) that are simply wrong. Contrary to what the majority seems to think, no one is proposing that every equitable distribution be deducted from the income of the paying spouse for child support purposes. The logic of defendant's argument, which I think is correct, applies only where an asset is distributed that is the source of a material portion of either party's predivorce income. If the distributed asset is not income-producing—if it is a house the parties live in, or an automobile or jewelry—the issue of reallocating income does not arise. But if the asset in question is income-producing, reallocation is necessary whether the asset

is distributed in kind or by payment of its value in cash, and whether the distribution is made all at once or over a period of years. It is not the distributed asset itself (e.g., an apartment building) that should be reallocated; it is the resulting income (the rent the building produces). (In the *O'Brien* context, the distinction between the "asset" [the license] and the "income" [the money earned by virtue of the license] can be confusing, because, except in matrimonial law, a professional license is not usually thought of as an "income-producing asset." But, as mentioned above, this kind of "asset" should not be treated differently than an apartment building or a share of stock.)

In holding that the CSSA forbids reallocation of income where an income-producing asset is equitably distributed, the majority needlessly renders the statute rigid and irrational.

### III

The parties in this case were married for 19 years before divorce proceedings began. Defendant was a doctor for more than 16 of those years, and by the time of the divorce was earning an annual income of approximately $180,000. No suggestion was made by either party that that sum does not fully reflect the value of his medical license, or of other credentials he obtained in the early years of the marriage. In other words, this is not a case where one party made sacrifices to put the other through school, but was prevented by divorce from enjoying the resulting benefits. The benefits of the sacrifices both parties made have been enjoyed by both of them for more than a decade, and are fully reflected in defendant's current income.

Supreme Court nevertheless felt compelled to apply our decision in *O'Brien*, which held that a medical license is an "asset" subject to equitable distribution. It did this by dividing defendant's $180,000 income into an "asset" portion and an "income" portion, and awarding plaintiff a percentage of both. In principle, this was a largely useless but harmless exercise. In light of a number of complicating factors, however, applying *O'Brien* to this and similar cases is worse than useless. I therefore think we should hold that the application of *O'Brien* is restricted to cases where its application produces some significant benefit.

The prototype of such a case is *O'Brien* itself. Michael and Loretta O'Brien were married for nine years. At the beginning of the marriage, he had not yet obtained his bachelor's degree. During the marriage, he obtained that degree, took premedical

courses, went to medical school, completed his internship and obtained a license to practice medicine. His wife helped him to become a doctor by giving up her own opportunity to obtain a professional certification, working in various jobs and contributing her earnings to their joint expenses. Two months after getting his license, he began an action for a divorce. While his income at that moment was apparently meager, his medical license had created sufficient "enhanced earning potential" that an expert was able to value the license at $472,000 (66 NY2d at 582).

*O'Brien*, in short, presented what the Appellate Division in that case called "the classical 'student-spouse, working-spouse' syndrome" (*O'Brien v O'Brien*, 106 AD2d 223, 231 [2d Dept 1985])—a situation which, the Appellate Division dissent noted, had been called "almost a cliche" (*id.* at 234 [quoting *Washburn v Washburn*, 101 Wash 2d 168, 173, 677 P2d 152, 155 (1984)]). This is a situation with which courts and commentators have struggled both before and since the *O'Brien* decision. Our solution in *O'Brien* was to hold that the medical license constituted "marital property," and that a portion of its value could be paid to Loretta O'Brien as a distributive award.

In *O'Brien* we became the first state court of last resort to hold that a professional license is marital property, though the Supreme Court of Iowa had previously come close to doing so (*In re Marriage of Horstmann*, 263 NW2d 885 [Iowa 1978]). Some may have hoped that *O'Brien* would begin a trend; if so, those hopes have been disappointed. In 19 years, not one other state has adopted the *O'Brien* rule,[3] and Iowa seems to have backed away (*In re Marriage of Francis*, 442 NW2d 59 [Iowa 1989]). In the other 49 states, a professional license is not itself an asset subject to equitable distribution, although in many states the enhanced earning capacity reflected by a license may be considered in awarding alimony or maintenance, or in distributing other assets (*see e.g. Downs v Downs*, 154 Vt 161, 574 A2d 156 [1990]; *In re Marriage of Olar*, 747 P2d 676, 680-681 [Colo 1987] [en banc]; *Drapek v Drapek*, 399 Mass 240, 246, 503 NE2d 946, 950 [1987]; *Mahoney v Mahoney*, 91 NJ 488, 501-505, 453 A2d 527, 534-536 [1982]; *DeWitt v DeWitt*, 98 Wis 2d 44, 60-61, 296 NW2d 761, 769 [1980]).

---

**3.** Some intermediate appellate panels in Michigan have adopted an *O'Brien*-like approach (*see Postema v Postema*, 189 Mich App 89, 94-101, 471 NW2d 912, 915-918 [1991]).

Comment on *O'Brien* in law reviews and legal journals has been mostly, though not unanimously, negative (*see* Heller, Letters to the Editor, *Relief Needed From O'Brien*, NYLJ, Dec. 11, 2002, at 2, col 6; Jacobson, *The Numbers Racket—Enhanced Earning Capacity*, 34 NY St Bar Assn Fam L Rev [No. 3] 7 [Fall/Winter 2002]; Davis, *The Doctrine of O'Brien v. O'Brien: A Critical Analysis*, 13 Pace L Rev 863 [Winter 1994]; Marnell, Outside Counsel, *Treatment of Enhanced Earning Capacity As an Asset Under Equitable Distribution*, NYLJ, Sept. 17, 1992, at 1, col 1; Batts, *Remedy Refocus: In Search of Equity in 'Enhanced Spouse/Other Spouse' Divorces*, 63 NYU L Rev 751 [1988] [all criticizing *O'Brien*'s holding or observing that it is extremely difficult to apply fairly]; *but see* Kelly, *The Marital Partnership Pretense and Career Assets: The Ascendancy of Self Over the Marital Community*, 81 BU L Rev 59 [Feb. 2001], and Willoughby, *Professional Licenses as Marital Property: Responses to Some of O'Brien's Unanswered Questions*, 73 Cornell L Rev 133 [Nov. 1987] [both praising some principles in *O'Brien*]). Much of this commentary reflects a sense that whatever benefits in fairness may be gained from the *O'Brien* rule are outweighed by the complexities and uncertainties it introduces into matrimonial litigation.

It may be doubted whether an innovation which has attracted so little imitation, and so little praise, will endure forever. However, I do not suggest that we should now overrule *O'Brien*. The potential for injustice in the "student-spouse/working-spouse" syndrome is very real, and *O'Brien* is an attempt to remedy it; it is an imperfect remedy, but no remedy would be perfect. I make now the more modest suggestion that *O'Brien* be applied only in those situations where there is a problem for *O'Brien* to remedy—not where *O'Brien* puts the parties and the court through a complex and largely empty exercise. This emptiness may be illustrated by the present case, where Supreme Court felt compelled by *O'Brien* to go through a process that may be analogized to rolling up a carpet, for no other purpose but to unroll it again.

Plaintiff's expert, Johnson, divided defendant's current earnings of $183,000[4] into two parts: $69,000, which is what Johnson thought defendant would have earned without a medical license,

---

4. The small discrepancy between this number and the income number in the chart at page 16 of this opinion reflects some consulting income that Johnson included and defendant's brief did not.

and $114,000, the additional income the license brought him. Making certain assumptions about how long defendant would work, and taking taxes into account, Johnson then converted the $114,000 portion of defendant's annual income to a present value of $874,000 (rolling up the carpet). Since the parties were married for 70% of the time when defendant was obtaining his license, Johnson found the value of the "marital portion" of the license to be $612,000. Supreme Court accepted Johnson's $612,000 figure, and decided that plaintiff's "equitable share" of the license should be 35% or $214,200. After reducing this number to account for defendant's conveyance of his interest in the marital residence, Supreme Court required defendant to pay the remaining sum, with interest, over a 15 year period (unrolling the carpet).

Johnson determined that the remainder of defendant's income—the $69,000 he would have received without a medical license, and the 30% of the remaining $114,000 that did not go into the computation of the "marital assets"—was "available for maintenance." He suggested that the court award maintenance in the amount of $35,000—34% of the "available" income. The court accepted this suggestion, though it decided that maintenance should be reduced to $20,000 after five years.

Thus, in oversimplified summary, an expert was paid to divide defendant's income into two pieces so that the court could award approximately 35% of each piece, with both awards to be paid over a period of years. It would have saved considerable trouble, not to mention expert fees, simply to award as maintenance 35% of the whole thing. And although the summary is oversimplified, the omitted complexities furnish no good reason for applying *O'Brien* here, and some added reasons for not applying it.

The first of these omitted complexities is that Supreme Court actually awarded less than 35% of defendant's total income, because the maintenance percentage decreases after the first five years. Obviously, this adjustment did not depend upon the application of *O'Brien*; if the court had awarded maintenance based on defendant's entire income, it could have chosen percentages that would have produced an economically identical result. The same applies to the differences in duration between the *O'Brien* equitable distribution award (15 years) and the maintenance (for plaintiff's life or until her remarriage). If the court had awarded maintenance based on defendant's total income, it could have chosen to change the amount of the award, or cease it altogether, at any point or points in time.

Secondly, the distinction between maintenance and an equitable distribution complicates the tax picture, for maintenance is deductible to the paying spouse and taxable to the receiving spouse, while an equitable distribution is neither. Thus in this case, the combined effect of the court's maintenance and equitable distribution awards was to award more than 35% of defendant's after-tax income. Taxes are a factor that should be considered in setting the amount of any award, and Supreme Court's opinion states that they were considered here. As long as the court takes tax impact into account, and as long as the parties pay the same effective tax rate, it should be possible to obtain identical after-tax results either by awarding maintenance or by awarding equitable distribution under *O'Brien*. In the (probably rare) case where the receiving spouse pays a higher effective tax rate than the paying spouse, the use of *O'Brien* will actually be tax efficient. But in the (probably less rare) situation where the paying spouse is taxed at a *higher* rate, *O'Brien* will have a perverse tax effect: by causing a portion of the annual payments to be characterized as "equitable distribution," *O'Brien* will enrich the government, by foreclosing an opportunity to move taxable dollars from the party with the higher tax rate to the party with the lower one.

Thirdly, in light of the anomaly discussed in part II of this dissent, the application of *O'Brien* distorts the child support calculation. The majority holds (I think incorrectly) that the CSSA forbids the reallocation, for child support purposes, of the income on which an *O'Brien* award is based. If the same amount is distributed as maintenance, the effect of the CSSA is less harsh: the statute permits deducting maintenance from the husband's income for child support purposes, though it does not permit adding it to the wife's (Domestic Relations Law § 240 [1-b] [b] [5] [vii] [C]).

Fourthly, a multiyear equitable distribution under *O'Brien*, unlike an award of maintenance, does not cease at the recipient's death or remarriage. It is possible to debate in particular cases whether, from the point of view of fairness, this is an advantage or disadvantage of the *O'Brien* approach. I do not think it will always be an advantage. In this case, for example, if the parties had remained married, and plaintiff had happened to predecease defendant, her estate would have had no claim on his medical license, or the income derived from it. I do not see why divorce should change that. But even assuming that, in many or most cases, this feature of the *O'Brien* approach produces a more just

result, I do not think the peripheral advantage thereby gained is worth the trouble. Where a court thinks the risk of injustice, in the event of death or remarriage, is significant in a particular case, devices much less cumbersome than *O'Brien* are available to mitigate the problem.

Finally, it may be said that in characterizing annual payments to an ex-spouse as maintenance. rather than a distributive award, the courts deny the recipient's status as "partner." The theory is that, to use this case as an example, plaintiff's contributions to defendant's attainment of his medical license make her equitably a 35% partner in the marital portion of that asset, and thus it is symbolically wrong to award her 35% of his income only as maintenance, rather than as something she owns. What is theoretically right or wrong in this area is a difficult, almost a metaphysical, question.[5] I do not propose to debate that question here. I think it enough to say that the pursuit of a theoretical or symbolic goal does not justify the practical burden involved in following the circuitous and confusing *O'Brien* route to a result which will be, in practical terms, usually no better and often worse than a simple award of maintenance.

For all these reasons, I believe that *O'Brien* should be limited to cases involving the "student-spouse/working-spouse" syndrome, or some reasonably analogous situation. *O'Brien* should not be used where, as here, the enhanced earning capacity associated with the professional license is already fully reflected in the license holder's earnings.

While the result I advocate would certainly involve a retreat from the broad language of *O'Brien* and other cases, I do not think it is inconsistent with any of our prior holdings. In particular, I believe it is consistent with our holding in *McSparron*, which rejected the doctrine, developed in some lower court cases, that the value of a professional license as an "asset" could be "merged" with the license holder's professional practice. I acknowledge that the analytical underpinning of the "merger" doctrine was in some ways similar to the analysis in this opinion; the "merger" doctrine was based on the thought that a

---

**5.** *See e.g.* Batts, *Remedy Refocus: In Search of Equity in 'Enhanced Spouse/Other Spouse' Divorces*, 63 NYU L Rev 751 (1988) (suggesting that the nontitled spouse be granted "compensation" rather than partnership status); Kelly, *The Marital Partnership Pretense and Career Assets: The Ascendancy of Self Over the Marital Community*, 81 BU L Rev 59, 125 (2001) (deploring the "rejection of partnership principles").

practicing professional will, in many cases, have realized the enhanced income that *O'Brien* was designed to capture, thus making the application of *O'Brien* unnecessary. We noted in *McSparron* that the "merger" doctrine "injects an artificial and unnecessarily confusing element into an already difficult assessment process" and that one "objection to the 'merger' theory is that it is difficult to apply" (87 NY2d at 284, 285). I do not propose to resurrect the doctrine of merger. Rather, I propose to recognize that, in a case like this one, *O'Brien* itself "injects an artificial and unnecessarily confusing element into an already difficult assessment process."

We noted in *McSparron* that "in particular cases" the value of a professional license "may be nominal" (87 NY2d at 285-286). We quoted this language, italicizing the words "it may be nominal," in our later decision in *Grunfeld* (94 NY2d at 704). Cases like this one, I believe, exemplify the point that an *O'Brien* analysis will sometimes add nothing of substance to deciding the appropriate award in a matrimonial case. Where that is true, *O'Brien* should not be applied.

### IV

Accordingly, I would vacate the judgment below and remit the case for further proceedings consistent with the views I have expressed.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK and ROSENBLATT concur with Judge GRAFFEO; Judge R.S. SMITH dissents in a separate opinion in which Judge READ concurs.

Order affirmed, with costs.