■ Ning-Yen Yao, Appellant, v Karen Kao-Yao, Respondent, and Chemtob Moss & Forman, LLP, Intervenor-Appellant. [48 NYS3d 337]—

Judgment, Supreme Court, New York County (Laura E. Drager, J.), entered March 10, 2015, to the extent appealed from as limited by the briefs, awarding defendant equitable distribution of 10% of plaintiff's enhanced earning capacity, maintenance of $5,000 per month, retroactive to June 1, 2009 and for one year following entry of the judgment of divorce, and counsel fees of $200,000, unanimously modified, on the law and the facts, and the matter remanded to Supreme Court for entry of an amended judgment that conforms with the court's decision dated October 15, 2013 and is in accordance herewith, and otherwise affirmed, with costs.

Although plaintiff appeals from several aspects of Supreme Court's judgment of divorce, the single most divisive issue between the parties is the court's decision to distribute an equitable share of plaintiff's enhanced earning capacity, due to his attainment of a medical license during the marriage.[1] Plaintiff contends there was a failure of proof because defendant's expert was unreliable, and even if reliable, plaintiff's enhanced earnings are solely due to his own efforts without any contribution whatsoever, whether economic or noneconomic, by defendant. We conclude that Supreme Court correctly relied upon defendant's expert in determining the value of plaintiff's enhanced earnings. We conclude further that the Supreme Court did not abuse its discretion in awarding defendant 10% of this marital asset for her noneconomic contributions (*Holterman v Holterman*, 3 NY3d 1, 8 [2004]; *see O'Brien v O'Brien*, 66 NY2d 576 [1985]).

The parties were married on May 27, 2000. They have two children, born in August 2002 and November 2004. This divorce action was commenced on October 11, 2007. By the time the parties met in December 1998, plaintiff had completed medical school and was in the middle of a one year internship at a local hospital in New York. He had already completed one year of his residency at a hospital in Boston. Plaintiff completed two out of three parts of the United States Medical Licensing exam during medical school, and passed the third part in February 2001, nine months after the parties married. Although plaintiff enrolled in an unaccredited fellowship program after graduation, he did not complete the program. In July 2003 he accepted employment with Lenox Hill Anesthesiology PLLC (LHA). Plaintiff has yet to pass the oral component of his medi-

---

[1]. This case was commenced before the law changed, eliminating the valuation of enhanced earning capacity as an asset of the marriage. The new law only affects cases commenced on or after January 25, 2016.

cal boards for anaesthesiology, although he has taken the exam twice. LHA was aware of this fact when they offered him partnership track employment. Plaintiff remains employed by LHA and although his employment agreement expired in 2007, he works under an "evergreen" renewal of the agreement, meaning he is working under the same terms and conditions.

Defendant took some college courses before marriage, but did not complete her bachelor's degree (in East Asian Studies) until May 2007. She has sporadically worked at various office jobs that pay $15 or less an hour. She also works as a Mandarin language tutor and for which she is paid $30 per hour. Throughout the marriage, however, defendant did not work outside the home. The parties maintained a fairly frugal lifestyle and vacations consisted mostly of visiting family. Frequently, defendant took the children on extended visits to China and on at least one occasion spent the summer there. Plaintiff did not always accompany the family on these visits.

Issues of equitable distribution, maintenance, and counsel fees were referred to a Special Referee to hear and report. This appeal involves the court's decision and order dated October 15, 2013, confirming in part and partly modifying and rejecting the Referee's recommendations in her January 22, 2013 report.

Witnesses at trial included the parties, their parents, James Richter, M.D., LHA's manager, and David Gresen, CPA/ABV, who was qualified as an expert in forensic accounting. Gresen was called as defendant's expert witness to value that part of plaintiff's enhanced earning capacity attained during the parties' marriage. Plaintiff did not call any expert on this valuation issue.

In preparing his report, Gresen relied on various documents, including plaintiff's W-2 forms, information about plaintiff's license to practice medicine, and his employment agreement with LHA dated July 14, 2003. Much of this information is not in dispute. Plaintiff obtained his New York State medical license on May 5, 2003 and he had income of $122,516 in 2003; $258,210 in 2004; $454,492 in 2005; $715,313 in 2006; and in 2007 his income was $837,253. Plaintiff was on a partnership track at LHA and was compensated the first year at an amount equal to 50% of what a representative full member of that partnership would receive; the second year, his compensation was 70%; the third year at 90%; and the fourth year and final year of the contract, which was 2007, also his earning year as of the date of trial, he received compensation equal to 100% of what a representative partner of LHA was paid. In valuing plaintiff's enhanced earnings, Gresen stated in his report and

testified at trial, that he was not provided with information regarding how plaintiff is paid or a breakdown between his basic compensation and any bonuses. Gresen could only state that plaintiff's compensation was determined by the accumulation of "points."

Gresen used a methodology commonly employed in determining the value of a medical license earned during a marriage (*Grunfeld v Grunfeld*, 94 NY2d 696, 702 [2000]). He first determined that plaintiff would have earned $173,000 per annum as a typical family practitioner, without the enhancement (baseline earnings). He then determined what plaintiff's earnings were with the license (topline earnings). Although Gresen proposed two different possibilities for topline earnings, the court accepted the lower value of $733,000, based upon a three-year weighted average of plaintiff's earnings from 2005 to 2007. Gresen deducted baseline earnings from topline earnings, detailed how tax impacted the amount, and made other adjustments, including a calculation of earnings over a work life expectancy, which was then reduced to reflect present value. He also applied a coverture fraction to reflect the fact that the enhancement was attained partly during the marriage and partly before. Based upon his mathematical calculations, Gresen valued plaintiff's enhanced earning capacity as $3,740,000.

At trial, plaintiff challenged some of Gresen's assumptions and Gresen made some further adjustments to his calculations. He reduced the coverture fraction from 75% to 69%, to account for the incomplete fellowship and a seven month leave of absence that plaintiff took from his residency (July 2000-February 2001) when he decided to explore a nonmedical career path. Gresen acknowledged that he had not known about the leave of absence, or realized plaintiff had not completed his fellowship. These adjustments resulted in a lower valuation of $3,440,000, which was ultimately accepted by the court.

At trial, plaintiff's employer, Dr. Richter, was called to testify about plaintiff's work habits and compensation. Apparently a primary purpose of Dr. Richter's testimony was to establish that Gresen's topline earnings calculation was incorrect. Dr. Richter testified that LHA doctors are compensated according to a formula using "units" and "compensation points," rather than straight hours worked, resulting in unpopular shifts, such as holidays, nights and weekends being worth more, and earning higher compensation, than more conventional days and hours. Dr. Richter also testified that he could not continue to employ plaintiff if he does not become board certified, and that

plaintiff is the only doctor on staff at LHA who is not board certified. Dr. Richter testified, however, that he has afforded plaintiff flexibility, because plaintiff is a valuable asset to the group. Plaintiff remains employed with LHA on the same employment terms and conditions, notwithstanding that his employment contract expired in 2007. Since 2007, which was his highest grossing year, plaintiff has earned less, but also worked fewer units. In 2008 he earned $554,848.85, in 2009 he earned $565,259, and in 2010 he earned $611,829.11.

The Referee found Gresen's valuation flawed, and recommended that his report, testimony and valuation be rejected in its entirety, resulting in no award of enhanced earnings to defendant (*Halaby v Halaby*, 289 AD2d 657, 660 [3d Dept 2001]). Alternatively, the Referee recommended that if the valuation of plaintiff's enhanced earnings was accepted by the court, then defendant's award should be no more than 10% of the enhanced earning capacity, because her contribution to this attainment was "de minimis." The Referee also recommended that plaintiff pay defendant taxable maintenance of $10,000 per month for four years after entry of the divorce judgment.

Supreme Court rejected the Referee's recommendation that Gresen's valuation was unreliable. The court determined that the methodology he used was "appropriate" and that adjustments made at trial accounted for any mistaken assumptions in his original calculations. After assessing defendant's contributions, the court awarded her a modest 10% of plaintiff's enhanced earnings. The court then rejected the Referee's recommendation on maintenance, finding that because defendant would be receiving equitable distribution, a lesser amount of maintenance for a shorter duration was appropriate. She was awarded permanent maintenance of $5,000 per month for a period of one year.

The party seeking distribution of an award based on the other party's enhanced earning capacity must establish its value through expert testimony (*Ruo Mei Cai v Lau*, 133 AD3d 541, 542 [1st Dept 2015], *appeal dismissed* 26 NY3d 1119 [2016], *lv denied* 27 NY3d 905 [2016]; *see generally Kurtz v Kurtz*, 1 AD3d 214, 215 [1st Dept 2003]). Defendant's expert used a methodology that is commonly used when calculating the value of enhanced earning capacity (*Grunfeld v Grunfeld*, 94 NY2d at 702; *O'Brien v O'Brien*, 66 NY2d at 582). Plaintiff's disagreement with certain assumptions made by the expert was not a basis to simply disregard the expert's opinion and treat it as a complete nullity. Some of plaintiff's criticisms resulted in adjustments in value at trial. Thus, for example,

the coverture fraction ultimately accepted by the court was adjusted downward in plaintiff's favor. Other challenges are simply without basis in the record. For example, plaintiff's challenge to Gresen's use of age 67 as plaintiff's projected retirement is unwarranted. Gresen explained that age 67 is the age when plaintiff will become eligible for full social security benefits (Social Security Administration, Full Retirement Age: If You were Born in 1960 or Later, https://www.ssa.gov/planners/retire/1960.html [accessed Jan. 24, 2017]). Plaintiff has not provided any data or expert opinion that anesthesiologists, as an entire profession, retire any sooner than the general population. Nor is the retirement age chosen by Gresen so out of bounds with our common experience on retirement that the court should have rejected the entire valuation out of hand.

Plaintiff's greatest challenge to Gresen's valuation is that the topline earnings, although based on his actual earnings, were too high to reflect what he could actually earn in the future. Plaintiff claims that he worked many hours in order to achieve those high earnings, and that he cannot continue to work at that pace throughout his career. Actual earnings, projected over time are, however, a recognized proxy for value of a person's future earning capacity (*McSparron v McSparron*, 87 NY2d 275, 286 [1995] ["The value of a newly earned license may be measured by simply comparing the average lifetime income of a college graduate and the average lifetime earnings of a person holding such a license . . . . In contrast, where the licensee has already embarked on his or her career and has acquired a history of actual earnings, the foregoing theoretical valuation method must be discarded in favor of a more pragmatic and individualized analysis . . . ."]). The court credited plaintiff's arguments to the extent that it decided to use Gresen's lower calculation of topline earnings in determining value. The expert's opinion was not and did not have to be completely disregarded because it was based upon plaintiff's actual earnings information (*McSparron*, 87 NY2d at 286). Although Dr. Richter's testimony may have highlighted some of the limitations in using past earnings as a predictor of future earnings, plaintiff offered no alterative expert evidence or calculations to demonstrate how such limitations would have, as a function of actual dollars, have changed topline projected earnings. Valuation of a professional license is largely dependent upon expert testimony and plaintiff made no effort to establish a different value by retaining his own expert for the court to consider (*see Heydt-Benjamin v Heydt-Benjamin*, 127 AD3d 814, 815 [2d Dept 2015]). The court was justified in rely-

ing on the only expert opinion it had, and making corresponding adjustments that took into account some of plaintiff's challenges.

The court also properly exercised its discretion in making a distributive award equal to 10% of plaintiff's enhanced earnings (*see Farrell v Cleary-Farrell*, 306 AD2d 597, 599-600 [3d Dept 2003]; *see Vora v Vora*, 268 AD2d 470, 471 [2d Dept 2000]). It is well-established law that both parties in a matrimonial action are entitled to "fundamental fairness in the allocation of marital assets, and that the economic and noneconomic contributions of each spouse are to be taken into account" (*Holterman*, 3 NY3d at 8). In reaching its decision the court below considered the statutory factors listed in Domestic Relations Law § 236, as well as the nontitled defendant spouse's direct and/or indirect contributions to the marriage (*Holterman* at 3; *see Del Villar v Del Villar*, 73 AD3d 651 [1st Dept 2010]). It is apparent from Dr. Richter's testimony that plaintiff was earning almost twice as much as other LHA doctors because he worked extraordinarily long hours, accepted unpopular shifts, like holidays, weekends and evenings, and was better compensated precisely because plaintiff kept this "totally unbalanced life." By not adhering to a more balanced work schedule, plaintiff necessarily shifted primary responsibility for his home life to defendant. Although he may have borne equal, if not primary, responsibility for the children when he was home, this was often a physical impossibility, given his demanding work schedule. Defendant not only made it possible for plaintiff to work the grueling schedule that he kept, she also made sure plaintiff was able to study without interruption for the boards on two separate occasions. She did this by taking the children away to visit relatives and doing other things to keep them out of his way.

Plaintiff's own testimony revealed that the parties lived a fairly frugal existence, although he was a high wage earner. Despite such income, plaintiff testified that the parties used a baby sitter, but never employed a full time nanny, and "never spent over $3,000 a month for any kind of childcare."[2] Given plaintiff's extended absences from the home while he worked double shifts and given the relatively young ages of the parties' children (six and eight) at the time of trial, the responsibility for their care necessarily fell to defendant. The fact that she may have been assisted by other family members or even, at

---

**2.** 2 This argument was raised in response to defendant's budget request of $3,000 a month in her statement of net worth. Plaintiff's did not testify how much the babysitter was paid.

times, a paid babysitter does not change this fact. In light of these contributions and others, the modest 10% awarded to defendant was equitable. This modest distribution took into consideration the court's determination that defendant's other contributions to plaintiff's enhanced earnings were not significant.

The maintenance award was also proper. The equitable distribution awarded is a very modest percentage of plaintiff's enhanced earnings and the maintenance awarded is not only for a very limited duration after the entry of judgment, but it is also a relatively small amount. Under these circumstances, there is no risk of double dipping using the same stream of income to pay both awards (*see Grunfeld v Grunfeld*, 94 NY2d at 705).

Turning to the award of counsel fees, such an award lies within the discretion of the court (*DeCabrera v Cabrera-Rosete*, 70 NY2d 879, 881 [1987]). In exercising this discretionary power, the Supreme Court was fully aware of the parties' financial circumstances and all other circumstances of the case, including the relative merit of the parties' positions (*id.*). The trial court providently exercised its discretion in awarding defendant $200,000 in counsel fees, an amount that only represents a portion of the counsel fees she actually sought. In making this award, the court considered the issues involved and the protracted nature of this litigation (*see Ansour v Ansour*, 61 AD3d 536, 537 [1st Dept 2009]).

There are, however, many inconsistencies between the judgment of divorce the court signed and the relevant court decision. "[W]hen there is an inconsistency between a judgment and the decision upon which it is based, the decision controls . . . [and] [s]uch an inconsistency may be corrected on appeal" (*Pauk v Pauk*, 232 AD2d 386, 390-391 [2d Dept 1996], *lv dismissed* 89 NY2d 982 [1997] [internal quotation marks and ellipsis omitted]; *see Herpe v Herpe*, 225 NY 323, 327 [1919]). The judgment should have only reflected the matters decided in the court's October 15, 2013 decision, the Referee's January 22, 2013 decision to the extent that it was confirmed and the parties' final parenting agreement. The pervasive inconsistencies cannot stand. We remind the parties that the court's decision is a snapshot in time and that after-occurring disputes, which were never adjudicated by the court, have no place in the judgment. The matter is, therefore, remanded to the Supreme Court for an amended judgment to be settled and entered correcting the following items:

The judgment incorrectly provides a direction that the award

of counsel fees is be deposited into the "current attorney's escrow account." The current attorney is not the attorney who represented defendant at trial. The decision, ordered payment "directly to the Wife's attorneys." Nancy Chemtob, Esq., of Chemtob Moss & Forman (CM&F), who represented defendant during the divorce action and at trial, is entitled to the fees. There is no provision that the fees be put in escrow. Since the court ordered plaintiff to pay $200,000 in legal fees "directly to the Wife's attorneys," the order in the judgment directing payment of counsel fees to "[d]efendant's current attorney's escrow account" is hereby stricken and the judgment shall instead require that payment counsel fees shall be "directly to Wife's attorneys, Chemtob Moss & Forman LLP." The timing and schedule of this payment (i.e., two equal payments, the first within 30 days of the entry of judgment, the second within four months from entry of judgment), remains unaffected by this order.

The judgment is also incorrect on the issue of custody. Custody was settled by the parties in a parenting agreement. The judgment contains language characterizing the rights of the parties in a manner different from the parenting agreement. Accordingly, the first two full paragraphs on page 3 of the judgment pertaining to custody are hereby vacated and an amended judgment shall be entered explicitly reflecting the rights and obligations contained in the parenting agreement.

The judgment contains a table listing various assets, identifying who the title owner of the asset was prior to trial, the value of the asset, the title holder after trial, the page in the decision or Referee's report where the asset is addressed for equitable distribution purposes, and whether plaintiff or defendant must make a payment to the other party. Some values and distributions are different from what was actually ordered. The table in the judgment is, therefore, stricken and an amended judgment should be entered precisely reflecting the values and distributions ordered by the court. While some of the inconsistencies cannot be reconciled on appeal because accounts listed in the judgment are not identifiable as the accounts referenced by the court, other discrepancies are apparent on their face.

On page 3, the first account listed, which is the Fidelity account ending in 8931, bears the value of $547,559. It states the asset is in defendant's name, and orders that defendant must pay plaintiff "$166,050." The amount of $166,050 is incorrect. The same table, continuing on page 5 of the judgment, states that "Defendant's transfers to her sole Fidelity account" (no

identifying account number provided), is valued at $94,000, defendant is the sole title holder, but that defendant pays to plaintiff "$0" referring to page 15 of the court's decision and page 50 of the Referee's report. The Referee recommended and the court confirmed, however, that plaintiff is entitled to a $47,000 credit. The award of "$0" has no basis in the record and it is stricken. On page 6 of the judgment, the HSBC account ending in 6975 states that the value of that account is $100,099 and that "defendant pays to plaintiff $50,049." This is an incorrect distribution. The court confirmed that plaintiff is entitled to an off the top credit of $40,000 (Referee's report page 50 and decision page 16), and that the balance of $60,099 be divided equally between the parties, requiring that plaintiff pay the amount of $70,049.50, reflecting the credit and division of this asset. There are inconsistencies regarding an account solely identified as "[d]efendant's transfer to sole Fidelity Acct" and "[d]efendant's transfer to sole HSBC Acct." In briefing this appeal, each side has presented redlined judgments with widely different figures, credits and explanations for why the judgment is incorrect and plaintiff claims he is due an additional $87,000 payment. These discrepancies must be settled in the amended judgment.

The judgment also incorrectly includes child support arrears. Section D appearing on pages 9 and 10 of the judgment indicates there are $75,641.24 in purported child support arrears owed by plaintiff, but there is no finding of arrears either in the court's decision or the Referee's report. Section D of the judgment appearing on pages 9 and 10 is stricken in its entirety. The only child support arrears awarded was $1,700 for a Chinese language program. The amended judgment should reflect this decision.

The court, in its decision, made the retroactive maintenance award "taxable" to defendant, but the judgment (page 10, first full paragraph, third sentence) contains decretal language that classifies the award as "nontaxable." The language pertaining to maintenance on page 10, first full paragraph of the judgment, third sentence is therefore stricken and the amended judgment should provide that the retroactive payment of maintenance is taxable.

We have considered all of plaintiff's remaining arguments and find them unavailing. Concur—Friedman, J.P., Renwick, Saxe and Gische, JJ.