Lynch v Lynch (2019 NY Slip Op 00105)





Lynch v Lynch


2019 NY Slip Op 00105


Decided on January 9, 2019


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 9, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
RUTH C. BALKIN
FRANCESCA E. CONNOLLY
LINDA CHRISTOPHER, JJ.


2016-02036
 (Index No. 30529/11)

[*1]Rebecca Lynch, appellant,
v
Sean T. Lynch, respondent.


Marilyn J. Wenz, P.C., Islandia, NY, for appellant.
Eric Dubinsky, Westbury, NY, for respondent.



DECISION & ORDER
In an action for a divorce and ancillary relief, the plaintiff appeals from stated portions of a judgment of divorce of the Supreme Court, Suffolk County (James F. Quinn, J.), entered December 15, 2015. The judgment, upon a decision of the same court, dated April 8, 2015, made upon the parties' written submissions, inter alia, (1) declined to make any equitable distribution award to the plaintiff relating to a Master of Business Administration degree received by the defendant during the marriage, (2) directed that the parties were equally responsible for certain amounts the defendant borrowed from the parties' home equity line of credit, and (3) granted the defendant an equitable distribution credit for one-half of the amount he paid to satisfy the student loans he took out while studying for his Master of Business Administration degree.
ORDERED that the judgment is modified, on the law, on the facts, and in the exercise of discretion, by deleting the provision thereof granting the defendant an equitable distribution credit for one-half of the amount he paid to satisfy the student loans he took out while studying for his Master of Business Administration degree; as so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements.
The parties were married on December 26, 1993. It was a second marriage for both parties. There are no children of this marriage, though the defendant has three children from his prior marriage and the plaintiff has one child from her prior marriage.
This action for a divorce and ancillary relief was commenced on October 4, 2011. The parties entered into a "Limited Issue Retirement Benefits Stipulation," dated July 1, 2014, in which the parties resolved the issues of equitable distribution of their retirement assets, essentially providing for an equal distribution of the parties' respective retirement plans and accounts. They also entered into a second stipulation, also dated July 1, 2014, entitled "Limited Issue Marital Assets Stipulation," resolving the issues of equitable distribution pertaining to certain specified assets, with the majority of the identified assets being shared equally. The remaining equitable distribution issues were determined by the Supreme Court in a decision dated April 8, 2015. A judgment of divorce was entered on December 15, 2015. The plaintiff appeals, as limited by her brief, from certain portions of the judgment.
The Supreme Court did not conduct any trial or hearing. However, in an order dated [*2]July 3, 2014, the court directed the parties to tender on paper their contentions regarding enhanced earning capacity, counsel fees, and equitable distribution, including assets and liabilities. The parties complied with this directive and, further, on April 7, 2015, counsel for the parties entered into a written stipulation pursuant to which it was agreed that the identified issues would be decided upon the written submissions provided to the court. While we disapprove of this unorthodox procedure, the resort to it provides no basis for reversal given the explicit consent by counsel to forgo the parties' respective rights to a trial on the contested issues.
At the time of the marriage, the plaintiff resided in Memphis, Tennessee, and was employed as a Senior Programmer Analyst for FedEx Services. The defendant, who had obtained a Bachelor's degree from Pace University, was employed in New York by J.P. Morgan as a Vice President and was earning approximately $190,000 per year. The plaintiff sold her home in Memphis and relocated to Long Island in order to establish a home with the defendant. She undertook employment in New York. The defendant's annual income from J.P. Morgan rose until it peaked at $233,562 in 1996; in 1997, his last year with J.P. Morgan, his annual income was $228,400. In 1998, the defendant was employed by a different company, and he earned $222,848 in that year. However, in 1999, he was unemployed for three months, though he still managed to earn $215,210 that year. After earning $204,463 in 2000, the defendant's income fell to $155,994 in 2001 because he lost his job in October or November of 2001, and he did not regain employment until February 2003.
The defendant commenced studies for a Master of Business Administration degree (hereinafter MBA degree) at Dowling College in September 2002. He attended Dowling College until December 2003 and was awarded an MBA degree in May 2004. His classes were held on Saturdays and he studied and prepared papers without assistance from the plaintiff. His tuition and books were paid by student loans and by credit card. The plaintiff, however, provided the defendant with funds for personal and living expenses, paid joint expenses such as the home mortgage and car insurance, provided medical insurance through her employment, maintained the marital residence, and helped care for the children and the family pets.
The defendant obtained a consultant position with J.P. Morgan Chase in February 2003. He earned $104,207 in 2003, which increased to $154,999 in 2004 and to $186,564 in 2005, though the 2005 earnings included compensation for part-time teaching at Dowling College. In 2006, the defendant obtained a position with Citigroup as a Senior Vice President and his earnings, augmented by continued part-time teaching, were $239,813. His earnings in 2007, inclusive of teaching, were $225,467; he earned similar amounts in 2007 and 2008. In 2009, his earnings were $234,880; in 2010, they were $231,293. In 2011, he earned $256,909, though he was no longer teaching at Dowling College as of that year. In 2012, he earned $260,847, and in 2013 he earned $250,000, though he was laid off in July 2013. The defendant earned $186,642.00 in 2014.
The plaintiff sought a distributive award of the enhanced earning capacity she asserted that the defendant derived from his MBA degree. She submitted an expert affidavit and report; the expert opined that the MBA degree enhanced the defendant's earning capacity in the commercial banking industry, and that the value of that enhancement was a total of $185,463 as of the commencement of the action. The expert arrived at that total by calculating the difference between (a) the defendant's "base line" earnings of $197,540 per year based upon statistical data showing this to be the typical annual compensation for a Vice President in the commercial banking industry in the same geographic area as the defendant, and (b) the defendant's "top line" earnings of $240,723 per year based on the income the defendant received as a Senior Vice President of Citigroup after he received his MBA degree. The expert concluded that the defendant had an additional enhanced earning capacity with a total value of $21,362 based on his part-time teaching as an adjunct professor at Dowling College. The Supreme Court found that the MBA degree earned by the defendant during the marriage did not provide him with any enhanced earning capacity subject to equitable distribution. The plaintiff contends that the court should have awarded her 35% of $206,000, which is the total of the two separately determined enhancements calculated by her expert, rounded down. We agree with the court's determination.
The defendant's MBA degree is marital property subject to equitable distribution in this case (see generally O'Brien v O'Brien, 66 NY2d 576; Haspel v Haspel, 78 AD3d 887, 890). The value of the MBA degree is measured by the present value of the enhanced earning capacity which it affords the defendant (see O'Brien v O'Brien, 66 NY2d at 588; McGowan v McGowan, 142 AD2d 355, 356-358). The non-titled spouse is required to establish the value of the enhanced earning capacity and demonstrate that the non-titled spouse made a substantial contribution to the acquisition of the degree (see Shkreli v Shkreli, 142 AD3d 546, 548; Elsayed v Edrees, 141 AD3d 503, 505; Badwal v Badwal, 126 AD3d 736, 737; Higgins v Higgins, 50 AD3d 852, 853).
Where a holder of an advanced degree has already embarked on his or her career and has acquired a history of actual earnings, the theoretical valuation method, which compares the average lifetime earnings of a college graduate against the average lifetime earnings of a person holding the relevant advanced degree, must be discarded in favor of a more pragmatic and individualized analysis based on the titled spouse's remaining professional earning potential (see McSparron v McSparron, 87 NY2d 275, 286). Actual earnings, projected over time, are a recognized proxy for the value of a person's future earning capacity (see Ning-Yen Yao v Kao-Yao, 147 AD3d 624, 629). The valuation must be founded in economic reality (see Sheehan v Sheehan, 161 AD3d 912, 914).
Here, the defendant started his studies for the MBA degree at a time when he was unemployed and was seeking to improve his prospects for obtaining new employment. In calculating the defendant's "base line" earnings for valuation purposes, the plaintiff's expert, noting that the defendant was a Vice President at J.P. Morgan when the parties married, used statistical data showing the typical income expected of a Vice President in the commercial banking industry in the same geographic area, which was $197,540 per year. For the "top line" earnings, the expert used the defendant's actual earnings as a Senior Vice President at Citigroup of $240,723 per year. The conclusion of the plaintiff's expert that the differential between these "base line" and "top line" earnings reflects an actual enhancement to the defendant's lifetime earning capacity is fundamentally flawed. The defendant did not acquire his MBA degree until May 2004. Between 1996 and 2000, the defendant's actual earnings exceeded the "base line" earnings attributed to him. Thus, we agree with the Supreme Court's conclusion that the statistical data used by the plaintiff's expert to establish the defendant's "base line" earnings significantly understated the defendant's pre-MBA degree earnings capacity. Given that the defendant earned $233,562 while employed by J.P. Morgan in 1996, we cannot accept the premise of the plaintiff's expert that his income of $240,723 per year while employed by Citigroup in 2011 reflects a substantial, measurable enhancement of his lifetime earning capacity attributable to his acquisition of an MBA degree in 2004. We see no error in the court's conclusion that obtaining the MBA degree merely allowed the defendant to secure employment at a substantially similar level of compensation to what he had earned in the past.
We also agree with the Supreme Court's determination that the defendant's part-time teaching position at Dowling College did not reflect an enhancement to his lifetime earning capacity by virtue of his acquisition of the MBA degree. In attempting to ascribe a value to the defendant's enhanced earning capacity, the plaintiff's expert compared the defendant's income of $16,185 per year as a part-time professor to what the expert determined to be the average earnings of men in the same geographic area with college degrees who were working comparable hours, specifically, $10,768 per year. However, as the court observed, the average earnings figure was artificially low, as the defendant consistently generated greater income than the statistical model would indicate. Under the circumstances, including that the teaching position was part-time and provided a supplement to his regular employment, it was appropriate for the court not to value the income stream from teaching as reflecting an enhancement of his earning capacity.
We also conclude that, even if the defendant were to be viewed as having enhanced his lifetime income by reason of his acquisition of an MBA degree, the plaintiff failed to establish that she made substantial contributions towards his achievement of that degree. The defendant's classes took place on Saturdays. While the plaintiff doubtless undertook some additional household obligations while the defendant was at school or studying, she did not show that she made any sacrifices in her own career or assumed a disproportionate share of household tasks (see Higgins v [*3]Higgins, 50 AD3d at 853).
The plaintiff claims that the Supreme Court erred in various respects in its allocation of responsibility for marital debt. In general, expenses incurred prior to the commencement of a divorce action constitute marital debt and should be equally shared by the parties (see Minervini v Minervini, 152 AD3d 666, 668; Bogdan v Bogdan, 260 AD2d 521, 522). The court has broad discretion in allocating the debts of the parties to a matrimonial action (see Minervini v Minervini, 152 AD3d at 668; DiFiore v DiFiore, 87 AD3d 971, 974-975).
The plaintiff asserts that only $14,300 of the $95,937.26 outstanding on the parties' home equity line of credit (hereinafter HELOC) was used for marital purposes, and that the balance was used by the defendant to pay for college and living expenses of his children and to satisfy his maintenance obligations to his prior wife. We perceive no error in the Supreme Court's allocation of responsibility for the HELOC debt. As the court stated, the plaintiff established only that the defendant may have borrowed the sum of $30,000 from the HELOC to make a scheduled lump sum payment to his prior wife. This is not the sort of expenditure made during the marriage that may be second-guessed by the courts in a later divorce action (see Mahoney-Buntzman v Buntzman, 12 NY3d 415, 421-422). The record demonstrates that the plaintiff was well aware of the defendant's maintenance obligations to his prior wife, and that the plaintiff provided input in the establishment and modification of those obligations.
While the plaintiff claims that the Supreme Court's allocation of debt was inappropriate in a large number of instances, we find her position to have merit only in one respect. The court granted the defendant an equitable distribution credit for one-half of the amount he paid to satisfy the student loans he took out while studying for his MBA degree. These loans were obtained during the marriage, but were satisfied by the defendant after the commencement of this action. While the court declined to require the plaintiff to pay any portion of the balance of these loans as of the time of commencement, by granting the defendant an equitable distribution credit for one-half of the amount that he paid to satisfy those loans, the court effectively made the plaintiff responsible for one-half of this liability. Given that the plaintiff was not granted a distributive award based on the value of the MBA degree, and given the court's determination not to obligate the plaintiff to pay any portion of the balance of these loans herself, the provision giving the defendant an equitable distribution credit for one-half of the amount he paid to satisfy these loans should be deleted.
The plaintiff's remaining contentions are without merit.
SCHEINKMAN, P.J., BALKIN, CONNOLLY and CHRISTOPHER, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court